IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-01510-RBJ

JEANETTE A. WICKS,

    Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,[1]

    Defendant.

---

ORDER

---

The Court here reviews the Commissioner's decision determining that the Social Security Government Pension Offset ("GPO") provision applies to reduce the amount of Social Security benefit received by plaintiff Jeanette A. Wicks. Jurisdiction is proper under 42 U.S.C. § 405(g). This dispute became ripe for decision upon the filing of plaintiff's Reply Brief on February 5, 2013, and it was reassigned to this Court on the same day. The Court apologizes to both parties for the delay in reviewing the case.

**Factual and Procedural Background**

Plaintiff Ms. Wicks was born on September 17, 1940. Her work history includes, as pertinent to the present case, periods of time when she worked as an employee for various state and local organizations in Colorado that are covered by the Public Employees' Retirement

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and thus her name is substituted for that of Michael J. Astrue as the defendant in this suit. Fed.R.Civ.P. 25(d)(1). By virtue of the last sentence of 42 U.S.C. § 405(g), no further action needs to be taken to continue this lawsuit.

Association of Colorado ("PERA").  *See* R. at 196.  While covered by PERA she was exempt from paying Social Security taxes.

After first leaving a position with the State of Colorado, Ms. Wicks, then 55 years old, received a lump-sum payment for her PERA contributions in the amount of $22,144.08 on March 28, 1996.  *See* R. at 23–24, 40.  This payment included $4,429.09 in matched employer contributions.  *See id*.  In 2002, Ms. Wicks returned to work for the State of Colorado and was again covered by PERA, this time through 2004.  *See* R. at 199–200.  On January 26, 2006, by then age 65, she received a second lump-sum PERA payment for $4,440.82, including $2,220.41 in matched employer contributions.  *See* R. at 23–24, 40.  Following these two lump-sum payments, Ms. Wicks was no longer entitled to a PERA benefit.  *See* R. at 23–24, 40, 127.

In March 2006, Ms. Wicks began to receive her Retirement Insurance Benefit ("RIB") from the Social Security Administration ("SSA").  *See* R. at 123.  Her monthly retirement benefit payment should have been reduced under the SSA"s Windfall Elimination Program ("WEP") because of the lump sum pension payment she had received from PERA.  The WEP "was enacted in 1983 to prevent individuals who earned wages from both covered and non-covered employment from receiving an unwarranted windfall." *Rabanal v. Astrue,* No. 08CV2159-REB, 2010 WL 195016, at *1 (D. Colo. Jan. 13, 2010).  However, erroneously, no reduction was made.

On May 31, 2006 Michael D. Ringer, a Social Security Claims Representative for the Denver region, sent a letter to Ms. Wicks informing her that when her ex-husband, Lawrence Claine, passes away, she would receive a $1,298.00 per month in benefits as Mr. Claine's surviving divorced widow.  R. at 34.  That letter also informed her, incorrectly, that her PERA disbursements would not affect her survivor's benefit under the SSA's Government Pension

2

Offset ("GPO") rules. The GPO applies to a survivor's benefit in much the same way as the WEP applies to survivor's own retirement benefit.

Mr. Claine died in June 2009, and Ms. Wicks applied for survivor's benefits as his divorced widow. R. at 34, 38–39. At that time the SSA discovered its error in failing to impose a WEP reduction on Ms. Wicks' retirement benefit. R. at 52, 148. Ms. Wicks had received a total of $30.179.00 from the SSA for the period of March 2006 through May 2009 but should have received $25,744 due to the WEP offset. In October 2009, Ms. Wicks was informed that her Social Security benefit had been overpaid by $4,435.00. R. at 52. The SSA requested repayment of that amount. *Id.*

In December 2009, Ms. Wicks sought reconsideration of a WEP reduction to her retirement benefits and challenged the imposition of a GPO reduction to her survivor's benefit. R. at 56–58. On November 21, 2010, the SSA issued a detailed Reconsideration Determination for the reductions to Ms. Wicks' benefits. R. at 121–31. The agency decided to waive the past overpayment of $4,435.00 based on SSA "misinformation" that contributed to it. *See* R. at 59, 148. However, the agency determined that on an ongoing basis Ms. Wicks' retirement benefits must be reduced under the WEP, and that her survivor's benefit must be reduced under the GPO rules. *See* R. at 121–31.

In January 2011, Ms. Wicks requested a hearing before an Administrative Law Judge to challenge the SSA's decision to apply the GPO and WEP. *See* R. at 132–45. Ms. Wicks appeared *pro se* on July 15, 2011, via video teleconferencing from Grand Junction, Colorado, with ALJ Lyle Olson presiding via video teleconferencing from outside of Fargo, South Dakota. R. at 22.

On September 6, 2011, the ALJ issued a decision concluding that both Ms. Wicks' PERA payments are considered "pensions" triggering the WEP and GPO deductions. R. at 22–25. To calculate the amount of reduction, the ALJ prorated the two lump-sum amounts according to actuarial tables in the Social Security Program Operation Manual System ("POMS"). R. at 24–25. However, the ALJ concluded that, according to his reading of the actuarial tables, the March 28, 1996 lump sum was "extinguished" on December 1, 2007, thus eliminating the offset to her SSA benefit arising from that PERA disbursement on that date. Similarly, he concluded that the January 26, 2006 lump sum would be extinguished on October 29, 2015, thus ending the offset attributed to it on that date. R. at 25, 27. The ALJ remanded for a recalculation of the benefit based on these findings. R. at 27.

On November 4, 2011, the Appeals Council notified Ms. Wicks that it was reviewing the ALJ's decision on its own motion pursuant to 20 C.F.R. § 404.969. R. at 17. On May 1, 2012, the Appeals Council reversed the findings of the ALJ as to the extinguishment of the March 28, 1996 pension. R. at 7–8. Its decision explained that for purposes of the GPO, the proration of the pension "results in a corresponding reduction of monthly social security benefits payments," but the ALJ erred because this monthly reduction "continues throughout the individual's entitlement to benefits." R. at 8. Because the pensions are never deemed "extinguished" during Ms. Wicks' lifetime, the Appeals Council ordered that her monthly benefits be again recalculated. *Id.* The Appeals Council did not address the ALJ's conclusion concerning the WEP offset. *See* R. at 7-8.[2]

---

[2] As discussed later in this order, the WEP offset is immaterial in this case due to the effect of a "dual-entitlement" offset that also applies.

**Standard of Review**

This appeal is based upon the administrative record and the briefs submitted by the parties. Ms. Wicks is a *pro se* litigant whose "materials are entitled to a liberal reading." *Velasquez v. Astrue*, 301 F. App'x 778, 780 (10th Cir. 2008). However, "the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Id.* (quoting *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005)).

When reviewing a final decision by the Commissioner, the role of the district court is to examine the record and determine whether it "contains substantial evidence to support the [Commissioner's] decision and whether the [Commissioner] applied the correct legal standards." *Rickets v. Apfel*, 16 F.Supp.2d 1280, 1287 (D. Colo. 1998) (citing *Hamilton v. Secretary of Health & Human Servs.*, 961 F.2d 1495, 1497 (10th Cir. 1992)).

A decision cannot be based on substantial evidence if "it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988). More than a scintilla, but less than preponderance is required. *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004). Although the evidence may support two inconsistent conclusions, that "does not prevent an administrative agency's finding from being supported by substantial evidence." *Id*. The Court cannot "reweigh the evidence or substitute [its] judgment for that of the agency." *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Nonetheless, if the underlying decision "failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir.1993).

Finally, the Court's "review of an agency's interpretation of a statute or regulation it administers is highly deferential." *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999). "Such an interpretation is given controlling weight unless it is arbitrary, capricious, or contrary to law." *Id.*

**Conclusions**

Ms. Wicks' arguments on appeal are essentially two-fold:[3] (1) the Appeals Council and the Social Security Administration have denied her due process and discriminated against her; (2) the Appeals Council erred in determining that the prorated monthly lump-sum values are not "extinguished" after a certain number of months in the calculation of her GPO reduction.

*Due Process and Discrimination Claims*

Ms. Wicks in her complaint and opening brief makes various allegations as to the manner in which the Appeals Council and the Social Security Administration handled her case. Construed liberally, these complaints include the denial of a "chance to be present to defend [herself] during the final decision making process on May 1, 2012;" the failure to provide copies of requested SSA policies; failure to respond to Ms. Wicks more promptly; and the "fabrication" of facts. *See* [#1] at 7; [#18] at 3–5.

While the Court understands the frustration and dissatisfaction that Ms. Wicks has felt in the process of appealing the decisions related to her benefits, these even in totality do not rise to level of violating her right to due process. Due process requires that before a person can be deprived of a property interest, she must have at a minimum notice of the deprivation and a

---

[3] Ms. Wicks makes additional arguments and requests in her complaint and briefing, for example, requesting a jury trial and demanding punitive damages "due to stress from the inconsistencies in the decisions of the many SSA judges and staff." *See, e.g.*, [#18] at 14, 16. The Court agrees with the Commissioner that this Court's review does not allow for a trial by jury or punitive damages. *See* 42 U.S.C. § 405(g).

meaningful opportunity to contest it. *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 348–49 (1976).

Here, the Appeals Council gave Ms. Wicks notice that she would be able to provide additional evidence, and that she may request to appear before the Appeals Council to present oral argument. R. at 17. In accordance with 20 C.F.R. § 404.976, the Appeals Council will grant that request only "if it decides that your case raises an important question of law or policy or that oral argument would help to reach a proper decision." That the Appeals Council has discretion to deny Ms. Wicks oral argument is not a deprivation of Ms. Wicks' due process rights. Nor is Ms. Wicks deprived of due process because of the miscellaneous minor grievances she has against the SSA and its procedures.

I address, however, Ms. Wicks' argument that reversal is warranted where the Appeals Council failed to consider new material submitted by Ms. Wicks upon notice that the ALJ's decision was being reviewed. Ms. Wicks provides as an exhibit to her complaint a lengthy response[4] that she timely submitted by fax to the Appeals Council on February 21, 2012. *See* [#1-2] at 9–20. The exhibit also contains a return letter from the Social Security Office in Grand Junction, Colorado, that verifies the office received the response letter by fax on February 23, 2012. *Id.* at 20. Nevertheless, the Appeals Council in its May 1, 2012 decision stated that "[n]o comments or additional evidence have been received." R. at 7. This letter and the accompanying verification letter are notably missing from the administrative record before this Court.

---

[4] Ms. Wicks also provides as an exhibit a letter by her dated February 10, 2012, which was not addressed by the Appeals Council. *See* [#1-2] at 8; R. at 10–11. In this letter, Ms. Wicks requested additional time to present new evidence to the Appeals Council and also to be provided copies of all policies and regulations for the WEP and GPO. *See id.* She did not make any additional legal arguments or submit evidence. *See id.*

7

Generally speaking, where "the Appeals Council explicitly states that it considered the evidence, there is no error, even if the order denying review includes no further discussion." *Martinez v. Astrue*, 389 F. App'x 866, 868–69 (10th Cir. 2010). The Tenth Circuit has stated that its "general practice . . . is to take a lower tribunal at its word when it declares that it has considered a matter." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).

However, the Appeals Council here did not explicitly declare that it reviewed the materials submitted by Ms. Wicks—to the contrary, it stated that it had received nothing from Ms. Wicks. *See* R. at 7. The Commissioner likewise does not provide any explanation for why this letter was neither included in the administration record nor discussed by the Appeals Council, even though it was verified as received by the Social Security Office. The Commissioner merely argues that it was sufficient that the Appeals Council "referenced Plaintiff's contentions in its decision" through one sweeping sentence that summarily rejected Ms. Wicks' contentions. *See* R. at 7 ("In its deliberations, the Appeals Council has also reviewed the claimant's contentions that the lump-sum paid should not be prorated over the claimant's lifetime."). The Court is not persuaded by this argument. *See Threet v. Barnhart*, 353 F.3d 1185, 1191–92 (10th Cir. 2003) (remanded where Appeals Council "gave no indication that it followed 20 C.F.R. § 404.970(b)" beyond citing the regulating and summarily dismissing the "without any reference to the newly submitted materials").

"[P]ursuant to 20 C.F.R. § 404.970(b), . . . 'new evidence [submitted to the Appeals Council] becomes a part of the administrative record to be considered when evaluating the Secretary's decision for substantial evidence.'" *Threet*, 353 F.3d at 1191 (quoting *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 2001)). Regulation 404.970(b) requires that the Appeals Council "consider evidence submitted with a request for review 'if the additional evidence is (a)

8

new, (b) material, and (c) relate[d] to the period on or before the date of the ALJ's decision.'" *Id.* (quoting *Box v. Shalala,* 52 F.3d 168, 171 (8th Cir. 1995)). Failure to consider qualifying new evidence is grounds for remand. *Id.*

Although the Court is not persuaded by the Commissioner's argument—or lack thereof—as to the Appeal Council's actual consideration of the letter submitted by Ms. Wicks, the Court must first consider whether the materials submitted by Ms. Wicks fall within the three requirements under 20 C.F.R. § 404.970(b). Upon a *de novo* review of the letter, the Court finds that it does not meet the regulation's requirement for "new" evidence. *See Threet*, 353 F.3d at 1191 (whether evidence "qualif[ies] as new, material, and chronologically pertinent is a question of law subject to our *de novo* review").

"Evidence is new within the meaning of [20 C.F.R. § 404.970(b)] if it is not duplicative or cumulative." *Id.* (quoting *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)). The Court cannot discern any "new" material in Ms. Wicks' letter that is not cumulative to the evidence presented to the ALJ and that was already in the record before the Appeals Council. *See* R. at 7 ("The Appeals Council has considered the entire record which was before the Administrative Law Judge."). Rather, the letter contains only legal arguments related to how her Social Security benefits were determined.

It is no wonder that Ms. Wicks is angry that her effort to submit material to the Appeals Council, on which she plainly spent a considerable amount of time, apparently went for nothing. The Court considered and initially was inclined to order a remand. However, I ultimately have concluded that, under 20 C.F.R. § 404.970(b), because this information did not contain material new evidence, a remand is inappropriate. Nor, in this circumstance, can this Court find that the Appeals Council's apparent error amounts to a deprivation of due process. What it amounts to is

9

carelessness, and this carelessness caused unnecessary angst and exacerbation of the litigation. That is not a new phenomenon in the history of this case, as we have seen in the SSA's initial failure to apply the WEP offset and Mr. Ringer's incorrect advice that there would be no GPO offset. In this Court's view, the least the Appeals Council could do would be to acknowledge its error and communicate an apology to Ms. Wicks.

Finally, the Court turns to Ms. Wicks' argument that the GPO unlawfully discriminates against retirees who did not pay Social Security taxes as a result of belonging to another government pension program such as PERA. *See* [#18] at 2, 13. A Tenth Circuit panel in an unpublished opinion rejected a similar argument. *See Clifford v. Sullivan*, No. 92-2029, 1993 WL 118836, at *2–3 (10th Cir. Apr. 15, 1993). As indicated in that case, "in regard to the social security system, governmental pensioners who have not contributed to the social security fund are not 'similarly situated' to private pensioners who have paid taxes for many years to the fund." *Id.* at *2. Ms. Wicks' employment with the State of Colorado enabled her to participate in a retirement system separate from Social Security and to be relieved of paying social security taxes during her period of employment there. "[T]he Equal Protection Clause does not prevent Congress from granting different levels of benefits" to the two different classes of pensioners. *Id.* at *3. Furthermore, even if all pensioners were similarly situated, "requiring that [Ms. Wicks'] insurance benefits be offset by a governmental pension is rationally related to a legitimate goal of protecting the fiscal integrity of the social security fund." *Id.*

Accordingly, the Court rejects due process and equal protection attacks on the offset programs and turns to the merits of the Appeals Council's decision on the calculation of her benefits.

*Calculation of Ms. Wicks' Benefits*

Ms. Wicks' argument focuses on whether the Appeals Council erred in determining that the PERA pension that she received in two lump sum payments, but which was prorated by the Commissioner, was not "extinguished" after a certain number of months such that the GPO would cease to apply to her survivor's benefit.

Under the Social Security Act an individual who is at least 62 years old and who is "fully insured" is entitled to receive monthly retirement insurance benefits, otherwise referred to as the primary insurance amount ("PIA"). *See* 42 U.S.C. §§ 402, 415(a)(1). The PIA is initially calculated based on the worker's average monthly earnings, *see id*. § 415, but the PIA may then "be adjusted based on a number of different considerations and circumstances, one of which is whether the claimant receives, in addition to retirement income benefits under the Act, other monthly periodic payments based on 'non-covered' employment, that is, wages exempt from Social Security taxes." *Rabanal*, 2010 WL 195016 at *1 (citing *Stroup v. Barnhart*, 327 F.3d 1258, 1259–60 (11th Cir. 2003)).

As indicated above, for cases where a worker split his career between employment taxed for Social Security benefits and employment exempt from Social Security taxes—the latter being "noncovered" employment, Congress enacted the WEP "to eliminate the unintended 'double dipping' that accrued." *Stroup*, 327 F.3d at 1259; 42 U.S.C. § 415(a)(7). Prior to the WEP, "an individual who had worked for both covered and noncovered wages in the course of his employment history would receive both full Social Security benefits and whatever pension benefits were provided by his noncovered employment." *Id.* at 1259–60.

The WEP therefore applies to recompute the PIA when the claimant is entitled to "a monthly periodic payment . . . which is based in whole or in part upon his or her earnings for service which did not constitute 'employment' as defined in [42 U.S.C. § 410]." 42 U.S.C. § 415(a)(7)(A); *see also id.* § 415(a)(7)(B) (providing two alternative methods of recalculating the PIA, of which the larger is the new PIA).

As also discussed above, the GPO is another set of rules for recalculating the initial amount of benefit. It is based upon the same logic as the WEP but applies to workers who are entitled both to a government pension based on non-covered employment and to a Social Security benefit as a spouse or widow—or in Ms. Wicks' case, a surviving divorced widow. *See, e.g.*, *Heckler v. Mathews*, 465 U.S. 728, 732 (1984) (discussing history of the GPO). The survivor's Social Security benefit is reduced by two-thirds of the amount of "any monthly periodic benefit" that is "based upon such individual's earnings while in the service of the Federal Government or any State." 42 U.S.C. § 402(k)(5)(A); *see also* 20 C.F.R. § 404.408a. The GPO also applies where the individual receives any lump-sum payment that is a "commutation of, or a substitute for, periodic payments." 42 U.S.C. § 402(k)(5)(C).

The Appeals Council did not address the ALJ's conclusions regarding the WEP offset. However, where an individual is entitled to retirement benefits based on her own account and is also entitled to survivor's benefits, her survivor's benefits are reduced by an amount equal to her retirement benefits. *See* 20 C.F.R. § 404.407; 42 U.S.C. § 402(k)(3)(A). The effect of this "dual-entitlement offset" makes irrelevant the application of the WEP to Ms. Wicks' retirement benefit. When the retirement benefit is lowered by application of the WEP, the dual-entitlement offset would then subtract a lesser amount—i.e., the lower retirement benefit—from the survivor's benefit. Consequently, after the dual-entitlement offset, the survivor's benefit is

actually "increased" by the same amount that the WEP would have reduced the retirement benefit, such that the total aggregate benefit (the survivor benefit plus the retirement benefit) remains the same. *See* Response Brief [#23] at 5 n.2.

Therefore, the only calculation issue for this Court is whether the Appeals Council erred in reversing the ALJ's findings as to the GPO's application to Ms. Wicks' survivor's benefit. As an initial matter, there can be no serious dispute that the two lump-sum PERA payments were substitutes for monthly periodic payments and are "pensions" under the Social Security Act. As such, the GPO is applicable to Ms. Wicks' survivor's benefit. *See* 42 U.S.C. §§ 402(k)(5)(C), 415(a)(7)(A); *see also* SSA POMS GN 02608.100, RS 00605.364.[5]

It is important to note and to emphasize here that when an individual's non-covered pension benefit is paid in a lump sum, the Social Security Act provides that it "shall be allocated on a basis equivalent to a monthly benefit" in a manner "determined by the Commissioner." 42 U.S.C. § 402(k)(5)(C). *See also* 20 C.F.R. § 404.408a ("If the government pension is not paid monthly or is paid in a lump-sum, we will determine how much the pension would be if it were paid monthly and then reduce the monthly Social Security benefit accordingly."); SSA POMS GN 02608.100B.2. It appears to me that Ms. Wicks may not fully appreciate the extent of the discretion to determine the method of allocation that has been vested in the Commissioner by Congress.

The period that the pension covers is the period when the Social Security benefit will be reduced. 20 C.F.R. § 404.408a. This reduction period is "generally . . . clear from the pension

---

[5] Ms. Wicks does suggest that her PERA payments are should not be considered "pensions" for purposes of the offsets. *See* [#18] at 14 ("GPO was intended to be applied to civil servants receiving FULL pensions not those receiving small amounts in lump sum payouts because they DO NOT QUALIFY for a pension"). However, this Court is satisfied that her lump-sum payments are precisely the "commutation of, or a substitute for, periodic payments," 42 U.S.C. § 402(k)(5)(C), that the GPO rules anticipated.

plan." *Id.* Where it is not clear, however, it is necessary for the SSA to "determine the reduction period on an individual basis." *Id.*; *see also* SSA POMS GN 02608.400, RS 00605.364C.

To determine the reduction period of the GPO, I turn to the SSA's POMS guidelines, which provide "publicly available operating instructions of processing Social Security claims." *Rabanal*, 2010 WL 195016 at *3 (quoting *Wash. State Dep't of Social & Health Servs. v. Guardianship Estates of Keffeler*, 537 U.S. 371, 385 (2003)); *see also Ramey v. Reinertson*, 268 F.3d 955, 964 (10th Cir. 2001).[6] The POMS guidelines governing the GPO are found in subchapter GN 02608.

POMS GN 02608.400D.3 provides that "[w]hen the entire pension is paid in a lump sum, the amount may represent a specified period of time or a 'lifetime.'" The pension-paying agency may prorate the lump sum, and if so, that proration establishes a monthly amount for GPO purposes. If the paying agency does not prorate the lump sum, then the SSA does the proration, depending upon how the pension-paying agency treated the payment.

Specifically, the paying agency (1) can indicate that the lump sum is intended to represent payments for a specified period; or (2) indicate that the lump sum is intended to represent payments for a lifetime; or (3) indicate nothing about the intended period. If a period less than a lifetime is specified, the SSA will "[d]ivide the lump sum by the number of months in the period specified by the pension-paying agency." POMS GN 02608.400D.3a. But where the paying agency either specifies that the lump sum is intended to cover a lifetime period or leaves the period unspecified (which is treated the same as if a lifetime period were specified), the SSA

---

[6] Ms. Wicks argues that the "POMS does NOT have the force and effect of law." [#18] at 14. While the POMS policies do not have the force of law and are not binding on the SSA, *see, e.g.*, *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir.2000), the Tenth Circuit has explained that applications of the POMS provisions are entitled to deference unless they are "arbitrary, capricious or contrary to law." *See McNamar*, 172 F.3d at 766. Absent any indication to the contrary, the Court defers to the guidelines set out in the POMS for the calculation of Ms. Wick's benefits.

will "[d]ivide the pension lump sum amount by the appropriate actuarial value in the table below that corresponds to the worker's age on the date of the lump sum award." POMS GN 02608.400D.3b. This table of "actuarial values" takes into consideration the date when the recipient received the lump sum award and her age on that date. *Id.*

In Ms. Wicks' case, her two lump-sum payments were not prorated monthly by the pension-paying agency, PERA. Likewise, PERA did not specify a period of months that the lump sums were intended to cover. Therefore, the actuarial table in POMS GN 02608.400D.3b was appropriately used to determine her prorated monthly deduction. Ms. Wicks' first lump-sum payment falls within the fourth column on the actuarial table for lump sum awards dated prior to May 31, 2007. Her age was 55 at the time of that award. Therefore the "actuarial value" according to the table is 140.9.

One basic misunderstanding that seems to have bedeviled Ms. Wicks is the difference between the "actuarial value" provided by this POMS table, on the one hand, and mortality tables that indicate normal life expectancy, on the other hand. For example, in her testimony during the ALJ hearing, Ms. Wicks stated that the POMS table indicated that at age 55 she would live 151 months. The number 151 appears to be a misreading of the table, which actually indicates 140.9 based upon the date she received the first lump sum. Her more fundamental error, however, was to assume that the table predicted a life expectancy of either 151 or 140.9 months, neither of which would make sense for a healthy 55-year old woman. As the ALJ indicated, Ms. Wicks was "comparing apples and oranges." R. at 214.

The Commissioner's method of allocating a lump sum pension on a lifetime basis divides the amount of the lump sum payment by the appropriate "actuarial value" provided in the table. The resulting number is a dollar amount that the SSA offsets against the claimant's monthly

15

benefit. Here, as to the first lump sum, one divides the amount of the payment, $22,144.08, by the actuarial value, 140.9, to reach a prorated value of the pension of $157.16 per month. *See also* R. at 24–25 (ALJ's same calculations). That amount is then offset against the survivor's benefit during the time the survivor receives the benefit, namely, Ms. Wicks' lifetime in this instance. One may think there are better ways to do it, but that is not for this Court to say. The Commissioner has been granted substantial discretion to determine the manner of allocation.

Ms. Wicks supports the decision of the ALJ. The reason is that the ALJ, having done everything strictly according to the book to this point, made one additional decision that is favorable to Ms. Wicks but which caused the Appeals Council sufficient dismay to review the case even in the absence of an appeal. He determined that the actuarial value number, here 140.9 as applied to the first lump sum payment, not only determined the monthly offset but also served to establish the number of months during which the offset could be applied. Specifically, he "conclude[d] that the plain language of POMS RS 00605.364[7] indicates that the end of the prorated period of the first lump sum, as indicated by the actuarial charts, is 140.9 months after receipt, or December 1, 2007." R. at 25. On that theory the first lump sum was "extinguished" as of that date. Similarly, the second lump sum will be extinguished at the conclusion of the number of months applicable to it as provided in the POMS table of actuarial value. R. at 25–26.

Problem is, the table that generated the 140.9 actuarial value was created, by its express terms, only to prorate a lump sum pension where the paying agency either indicates that a lifetime period was intended or, as here, leaves the period unspecified. The "actuarial value" is

---

[7] POMS RS 00605.364C.5b provides the same proration instructions and accompanying actuarial table for calculation of the WEP as POMS GN 02608.400D.3b provides for the GPO. The ALJ relied on this POMS guideline to calculate the offset for purposes of the GPO and the WEP, but as discussed above, the present issue is whether the GPO offset continues.

simply a number, albeit an important number that the Commission uses in determining the appropriate offset. The table does not purport to provide an end date.

If PERA had specified a period of months that the lump sum payment was intended to cover, then the Commissioner would have divided the lump sum by that number, and the offset would have ended when that period ended. *See* POMS GN 02608.400(D)(3)(a). For example, if, however improbably, PERA had indicated that the lump sum was intended to represent payments for a period of 140.9 months, then the offset would have been in the amount determined by the ALJ and would have ended precisely when the ALJ determined it ended -- not because of the POMS table, but due to the coincidence that the period specified by PERA in my hypothetical example happened to be 140.9 months. That, of course, is not what the facts require here.

I therefore must agree with the Appeals Council that the ALJ, on this sole but critical issue, was mistaken. The ALJ found authority for his conclusion in POMS rules concerning the WEP.[8] The POMS section cited by the ALJ, RS 00605.360, does indeed provide that the WEP computation is no longer used when "the entitlement to the pension payment ceases or the proration of a lump sum payment based on a specified period ends." However, that begs the question of whether entitlement to a pension paid as a lump sum but prorated over a lifetime ends. The ALJ concluded that "the plain language of POMS RS 00605.364 indicates that the end of the prorated period for the first lump sum, as indicated by the actuarial charts, is 140.9 months after receipt, or December 1, 2007." R. at 25. I find no such language in that POMS section. That section does provide that if the pension ceases and the recipient is no longer entitled to the pension, the SSA must recompute the benefit without the offset. However, there is no indication there or elsewhere in POMS to my knowledge that a pension allocated on a lifetime or unspecified period basis ceases during the claimant's lifetime.

---

[8] The distinction between GPO and WEP rules is not the problem, as the analysis is the same as to both.

The Court also notes that its "review of an agency's interpretation of a statute or regulation it administers is highly deferential." *McNamar*, 172 F.3d at 766. This Court thus gives the Commissioner controlling weight in his interpretation of both 20 C.F.R. § 404.408a and the related POMS provisions absent any evidence that their application was "arbitrary, capricious, or contrary to law." *Id.*

In sum, this Court concludes that there is both legal and evidentiary support for the Appeals Council's determination that the PERA pension paid in 1996 was not "extinguished" after 140.9 months but will continue to generate a monthly offset against Ms. Wicks' survivor's benefit during her lifetime. This could mean, as Ms. Wicks has argued, that the ultimate offset against her SSA benefit resulting from the lump sum payment will be greater than $22,144.08. The SSA apparently began applying the offset sometime in 2009, due to its waiver of the previous overpayment. If Ms. Wicks continues to enjoy a long life, as I hope she does, there will come a time, roughly in about 2021, when at an offset rate of $157.16 a month the total of the offsets resulting from the first lump sum will begin to exceed the amount of the lump sum. Although I respect her belief that this prospect is unfair, the calculations were based upon a proper application of the law.

**Order**

Accordingly, the decision of the Commissioner is AFFIRMED.

DATED this 12th day of November, 2013.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge